Jonathan Shub (State Bar No. 237708)
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Hwy E, Fl-2
Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

L. Timothy Fisher (State Bar No. 191626)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
T: 925-300-4455
F: 925-407-2700
ltfisher@bursor.com

*Plaintiffs' Attorneys*
*Additional attorneys on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY BARRETT, DANIELA GRUEN, LAURA HARMAN, MARILYN MOORE-BUICE, AND CAROLINE SPINDEL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>BURT'S BEES, INC., THE CLOROX COMPANY and THE BURT'S BEES PRODUCTS COMPANY,<br>Defendants. | DEMAND FOR JURY TRIAL<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR:<br><br>1. BREACH OF EXPRESS WARRANTY<br>2. BREACH OF IMPLIED WARRANTY<br>3. NEGLIGENT MISREPRESENTATION<br>4. FRAUD<br>5. VIOLATION OF CALIFORNIATION LEGAL REMEDIES ACT, CAL. BUS. & PROF. CODE § 1750, ET SEQ.<br>6. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, ET SEQ.<br>7. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500, ET SEQ.<br>8. VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. § 10-1-390, ET SEQ. |

9.  VIOLATION OF GEORGIA'S UNIFORM
    DECEPTIVE TRADE PRACTICES ACT,
    O.C.G.A. § 10-1-370, ET SEQ.
10. VIOLATION OF THE MICHIGAN
    CONSUMER PROTECTION ACT, MICH.
    COMP. LAWS ANN. §§ 445.903, ET SEQ.
11. VIOLATION OF THE NEW JERSEY
    CONSUMER PROTECTION ACT, N.J.
    STAT. ACT. § 56:8-1, ET SEQ
12. VIOLATION OF NEW YORK GENERAL
    BUSINESS LAW, § 349
13. VIOLATION OF THE NEW YORK
    GENERAL BUSINESS LAW, § 350
14. UNJUST ENRICHMENT, in the alternative

Plaintiffs Tracy Barrett, Daniela Gruen, Laura Harman, Marilyn Moore-Buice, and Caroline Spindel ("Plaintiffs"), bring this Consolidated Amended Class Action Complaint for equitable relief and damages against Defendants Burt's Bees, Inc. and The Burt's Bees Products Company, and their parent company, The Clorox Company, (collectively, "Burt's Bees" or "Defendants"), regarding the deceptive labeling, marketing, and sale of Defendants' cosmetic products ("the Products" or "PFAS Products").[1]  Plaintiffs, individually and on behalf of all others similarly situated, complain and allege the following based upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.      When purchasing cosmetic products, consumers are concerned about whether the product they are purchasing contains any dangerous chemicals. For this reason, consumers seek out

---

[1] The following Burt's Bees products are deceptively labeled and advertised as alleged in this Complaint: Burt's Bees Volumizing Mascara, Burt's Bees Nourishing Mascara, Burt's Bees Lip Shimmer, Burt's Bees Lip Shine, and Burt's Bees Lip Balm. Discovery may reveal that additional Burt's Bees' products should be included within the scope of the allegations in this Complaint, and Plaintiffs reserves the right to add such products.

beauty products with "natural" representations, which they believe to free from dangerous chemicals.[2]

2.      In an effort to appeal to these consumers, Burt's Bees claims their Products are "100% natural," [3] and that "we've made it a priority to clearly state the percentage of ingredients derived from nature on our product labels."[4] The Products' packaging likewise claim to be of "100% natural origin."[5]

3.      The Burt's Bees brand differentiates itself in the highly competitive beauty and lip care market by uniformly advertising its products as containing natural ingredients, using "responsible sourcing," and "consciously crafted with ingredients from nature to nourish and revitalize your skin."[6] In fact, Defendants represent that they formulate the Products "without . . . chemicals of concern,"[7] and with a mission to make "clean conscious skin care more inclusive."[8]

4.      Hoping to avoid dangerous chemicals, as described above, Plaintiffs purchased Burt's Bees Products which were represented as "100% Natural Origin" and/or "100% Natural."

5.      In reality, Plaintiffs' independent testing revealed that the Products contain organofluorine, an indicator of PFAS, which are neither natural nor sustainable.

6.      Per- and polyfluoroalkyl substances ("PFAS") are a group of synthetic chemicals that can provide certain marketable benefits for cosmetics products including "hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability."[9]

---

[2] Cheryl Wischhover, *The "natural" beauty industry is on the rise because we're scared of chemicals*, Vox (Sept. 18, 2018), https://www.vox.com/the-goods/2018/9/18/17866150/natural-clean-beauty-products-feinstein-cosmetics-bill-fda.

[3] *See, e.g., Lip Shimmer*, BURT'S BEES, https://www.burtsbees.com/product/lip-shimmer/VM-37499-00-1.html (last visited July 22, 2022).

[4] *Transparency in Natural Beauty*, BURT'S BEES, https://www.burtsbees.com/content/new-global-guidelines-for-natural-cosmetics/iso-guidelines.html (last visited July 22, 2022).

[5] *See, e.g., All Aflutter Volumizing Mascara*, BURT'S BEES, https://www.burtsbees.com/product/all-aflutter-volumizing-mascara/VM-792850908062.html (last visited July 22, 2022).

[6] *Values*, BURT'S BEES, https://www.burtsbees.com/values/ (last visited July 22, 2022).

[7] *Id.*

[8] Burt's Bees, *Up Close with Burt's Bees Skin Care, Balm & More, Consciously Made Since 1984*, YOUTUBE (Dec. 1, 2021), https://www.youtube.com/watch?v=-SzdUckYY1U.

[9] Heather D. Whitehead, et al., *Fluorinated Compounds in North American Cosmetics*, Environ. Sci. Tech. Ltrs. 2021, 538–44, https://doi.org/10.1021/acs.estlett.1c00240.

7.      PFAS, however, are also a group of definitively non-natural chemicals with known harmful effects on people and the environment. Consumers have grown increasingly aware of and concerned about PFAS and the presence of such in their bodies, the environment, and the products they use.[10]

8.      Far from being a "natural" ingredient, PFAS are a group of synthetic chemicals known to be toxic to humans, even at very low levels.[11]  Furthermore, PFAS are considered "forever chemicals," meaning they do not break down naturally in the environment.[12] Use of PFAS in the manufacturing of cosmetics and other products leads to the accumulation of PFAS in soil, water, humans, and elsewhere in the environment, threatening other organisms.[13]

9.      Representations that the Burt's Bees Products are "100% Natural" or "100% Natural Origin" mislead consumers into believing that the Products are not made with synthetic, toxic chemicals like PFAS, when in fact the Products are made with such chemicals.

10.     Reasonable consumers, such as Plaintiffs, would not expect a "natural" product to contain man-made chemicals.

11.     Moreover, consumers lack the information and scientific knowledge necessary to determine whether the Products are in fact made with PFAS and to know or to ascertain the true quality of the Products.

---

[10] LastWeekTonight, *PFAS: Last Week Tonight With John Oliver (HBO)*, YouTube (Oct. 4, 2021), https://www.youtube.com/watch?v=9W74aeuqsiU.

[11] The main concern with cosmetic products is dermal exposure, but studies on PFAS absorption through the skin are limited. Limited studies so far suggest "potential adverse effects from dermal exposure" to PFAS. See Hillary L. Shane, et al., *Immunotoxicity and allergenic potential induced by topical application of perfluorooctanoic acid (PFOA) in a murine model*, 137 Food & Chem. Toxicology 111141 (2020); *see also*, Ji-Seok Han, *Subacute dermal toxicity of perfluoroalkyl carboxylic acids: comparison with different carbon-chain lengths in human skin equivalents and systemic effects of perfluoroheptanoic acid in Sprague Dawley rats*, Archives of Toxicology, doi:10.1007/s00204-019-02634-z.

[12] As an illustration of how "forever" PFAS compounds are, in 1997, when a PFAS manufacturer sought "clean blood samples" to compare to PFAS-tainted samples, the only source of "clean blood" (free of PFAS contamination) was the "preserved blood of soldiers who died in the Korean War, before [PFAS] products spread worldwide." *See Poisoned Legacy*, Environmental Working Group (May 1, 2015), https://www.ewg.org/research/poisoned-legacy.

[13] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Inst. of Env't Health Sciences ("NIEHS"), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm#footnote2 (last visited Mar. 23, 2022); Francisca Pérez, et al., *Accumulation Of Perfluoroalkyl Substances In Human Tissues*, 59 Environ. Int'l 354 (2013).

12.     Reasonable consumers, therefore, fairly and reasonably understand that Burt's Bees products, which are marketed as clean, conscious, 100% natural, free of chemicals of concern, and environmentally sustainable (collectively the "Challenged Statements"), would not contain human-made chemicals like PFAS.

13.     In sum, Burt's Bees is deceiving consumers into believing the Products are made without any unnatural chemicals, when in fact some of them contain unnatural and potentially harmful PFAS chemicals.

14.     By deceiving consumers about the nature and quality of the Products, Burt's Bees is able to sell a greater volume of the Products, charge higher prices for the Products, and take away market share from competing products, thereby increasing its own sales and profits.[14]

15.     As a result of its marketing campaign, over the course of several decades, Burt's Bees brand of Lip Products has unfairly and deceptively gained the trust of thousands, if not millions, of consumers, who reasonably believe that Burt's Bees products, including the Lip Products, are made without non-clean or non-natural ingredients, such as PFAS. Consumers, including Plaintiffs, relied upon the Burt's Bees reputation and its supporting representations when they purchased the products.

16.     Consumers pay for Burt's Bees' self-proclaimed clean and 100% natural Products based upon Defendants' pervasive marketing that centers on the importance of using clean and "100% natural" ingredients, which are responsibly sourced, and environmentally sustainable.

17.     As a result of its false and misleading labeling and advertising and omissions of fact, Burt's Bees was and is able to sell the Products to consumers across the country and to realize sizeable profits.[15]

---

[14] "In 2019, Burt's Bees generated 19.3 percent of lip balm/treatment sales in the United States," making it "the leading lip balm/treatment brand[] in the United States." *See Dollar sales share of the leading lip balm/treatment brands in the United States in 2019\**, Statista, https://www.statista.com/statistics/463377/us-dollar-sales-share-of-leading-lip-balm-treatment-brands/

[15] In 2018, one tube of Burt's Bees Lip Balm was sold in the United States every second. *See* Macaela Mackenzie, *Burt's Bees Beeswax Lip Balm Has More Than 1,000 Five-Star Ratings on Target's Website*, Allure (Dec. 15, 2018), https://www.allure.com/story/burts-bees-beeswax-lip-balm-sold-every-second.

18.     Alternative formulation, designs and materials were available to Defendants at the time it formulated, designed, and manufactured the PFAS Products—including formulations, designs and materials that are used in its other non-PFAS products—and such alternative formulations and designs were and are used by other manufacturers to produce and sell clean, natural makeup.

19.     Plaintiffs tested a large sampling of other Burt's Bees products, including the All Aflutter Mascara, Defining Eyeliner, eye shadow, lip and cheek stick, liquid lipstick, blush, moisturizer, and concealer; however, no PFAS was detected in those products. Thus, Burt's Bees is capable of formulating, sourcing and selling its Products without PFAS.

20.     During any applicable statute of limitations period (the "Class Period"), Plaintiffs and Class Members (described below) saw Burt's Bees' "100% Natural" or "100% Natural Origin" misrepresentations when purchasing the Products. Plaintiffs and Class Members (described below) paid more for the Products based upon the misrepresentations than they otherwise would have paid, and/or purchased the Products, or purchased more of the Products, when they would not have if they had known the truth about the likely presence of PFAS. As a result, Plaintiffs and Class Members suffered injury. Contrary to representations on the Products' labeling and advertising, consumers received Products that likely contain PFAS.

21.     Burt's Bees' false and misleading representations and omissions violate the consumer protection laws of California, Georgia, Michigan, and New York, as well as common law.

22.     Because Burt's Bees' labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature and quality of the Products, Plaintiffs bring this deceptive advertising case on behalf of a class of consumers who purchased the Products, and seek relief including actual damages, interest, costs, and reasonable attorneys' fees. Even today, members of the proposed Classes are purchasing the misrepresented Products, and they will continue to do so in the future unless Burt's Bees' conduct is stopped.

23.     Plaintiffs seek damages and equitable remedies for themselves and for the proposed Classes.

**JURISDICTION AND VENUE**

24.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendants are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25.     On information and belief, Defendant Burt's Bees, Inc. is a citizen of the State of North Carolina.

26.     Defendant The Burt's Bees Products Company is a citizen of the State of California.

27.     Defendant The Clorox Company is a citizen of the State of California.

28.     The amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.

29.     This Court has personal jurisdiction over the Defendants. Defendants regularly conduct and transact business in California, purposefully avail themselves of the laws of California, market their Products to consumers in California, and distribute their Products to retailers in California.

30.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading labeling and advertising regarding the nature and quality of the Products and sales of the Products at issue, occurred within this jurisdiction.

**PARTIES**

**Plaintiffs**

31.     Plaintiff Tracy Barrett is a resident and citizen of Fresno, California, who purchased and used the PFAS Products within the relevant time period.

32.     Plaintiff Daniela Gruen is a resident and citizen of Jamesburg, New Jersey, who purchased and used the PFAS Products within the relevant time period.

33.     Plaintiff Laura Harman is a resident and citizen of Copemish, Michigan, who purchased and used the PFAS Products within the relevant time period.

34.     Plaintiff Marilyn Moore-Buice is a resident and citizen of Fayetteville, Georgia, who purchased and used the PFAS Products within the relevant time period.

35.     Plaintiff Spindel is a resident and citizen of Haverstraw, New York, who purchased and used the PFAS Products within the relevant time period.

**Defendants**

36.     Defendant Burt's Bees, Inc. is a North Carolina subsidiary that maintains its principal place of business located at 210 W Pettigrew St., Durham, North Carolina 27701.

37.     Burt's Bees, Inc. advertises, markets, and distributes Burt's Bees' Products in New York. Burt's Bees created and/or authorized the false and deceptive labeling and advertising of the Products.

38.     Defendant The Burt's Bees Products Company is incorporated in Delaware, with its principal place of business located at 1221 Broadway, Oakland, California 94612.

39.     The Clorox Company is a California company that maintains its principal place of business located at 1221 Broadway, Oakland, California 94612. It is the parent company of Burt's Bees, Inc. and The Burt's Bees Products Company.

40.     Upon information and belief, The Clorox Company wholly owns Burt's Bees, Inc.

41.     Defendants manufacture and/or cause the manufacture of the Products, and market and distribute the Products in retail stores nationwide. Defendants created and/or authorized the false and deceptive labeling and advertising of the Products.

## FACT ALLEGATIONS

### I. Burt's Bees Cosmetics

42.     Founded in the 1980's, Burt's Bees quickly became a household name for clean and natural products, including lip balms and other cosmetic products. Today, Burt's Bees products, including the PFAS Products, are in "more than 22 million households use our products every day."[16]

_____

[16] *2020 Impact Report*, *supra* note 6 at 18.

43.     Burt's Bees products are sold online, and at mass market beauty retailers, grocery stores, pharmacies, restaurants, and numerous other stores in the United States, including the Burt's Bees website, and other brick-and-mortar and online retailers including Ulta Beauty, Whole Foods, Amazon, Target, CVS, Walgreens, and Walmart.

44.     Defendant The Clorox Company acquired the Burt's Bees brand in 2007 for a reported amount of $925 million.[17]

45.     Before and following this acquisition, Burt's Bees has represented to consumers that it is committed to nature and environmentally sustainable products. To that end, it represents that it honors the environmental consciousness of its co-founder Roxanne Quimby and follows in her footsteps by "by using the best ingredients from nature, and in turn respecting nature so we can all live well."[18] In its recent 2020 Impact Report, Burt's Bees re-emphasized that commitment by stating[19]:

> At the very core of Burt's Bees' beliefs is this simple truth: Because we take from nature, we must work to preserve and protect it. We choose the best and most powerful ingredients from nature to formulate our products, so it's incumbent upon us to find ways to give back and preserve nature's incredible diversity, vitality and beauty…   We can reinforce the fact that nature is a remedy through every phase of our work, *from the supply chain to product formulation* to packaging choices to community partnerships.

46.     From the time of acquisition until the present, Defendants have continued to grow—and profit from—Burt's Bees' well-established position as a leader in the clean, natural beauty market.

47.     Allura reported in 2018, that Burt's Bees lip balm was so popular that it had more than 1,000 5-star ratings on Target's website, and that "[a] tube is sold once every *second*," equating to "86,400 lip balms a day," "600,000 Burt buys per week," and "[a]lmost 31.5 million lip balms sold every year!"[20]

---

[17] *Clorox to Buy Burt's Bees*, FORBES, https://www.forbes.com/2007/10/31/clorox-burts-bees-markets-equity-cx_af_1031markets15.html?sh=702ea96a79ba (last visited Jul. 27, 2022).
[18] *Our Story*, BURT'S BEES, https://www.burtsbees.com/our-story/ (last visited Jul. 27, 2022).
[19] *2020 Impact Report*, *supra* note 6 at 4 (emphasis added).
[20] Macaela Mackenzie, *Burt's Bees Beeswax Lip Balm Has More Than 1,000 Five-Star Ratings on Target's Website*, ALLURE (Dec. 15, 2018), https://www.allure.com/story/burts-bees-beeswax-lip-balm-sold-every-second.

48.    In 2019, it was reported that Burt's Bees had the lion share of the lip product market, with Burt's Bees having "generated 19.3 percent of lip balm/treatment sales in the United States," exceeding other well-known brands including Chapstick, Carmex, Blistex, Vaseline, and others.[21]

49.    Since its introduction into the consumer marketplace, and continuing since Defendant The Clorox Company's acquisition, the brand's entire marketing focus has centered on promotion of its clean, natural ingredient message.

**II. PFAS**

50.    PFAS are a category of highly persistent and potentially harmful human-made chemicals.[22]

51.    While there are thousands of varieties of PFAS chemicals in existence, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[23]

52.    PFAS chemicals are sometimes called "forever chemicals" and have been associated with a variety of negative health effects for humans and the environment.

53.    Humans can be exposed to PFAS through a variety of ways, including ingestion, inhalation, and skin absorption.[24]

54.    According to the FDA, PFAS are "intentionally added" to products such as lotions, cleansers, nail polish, shaving cream, foundation, lipstick, eyeliner, eyeshadow, and mascara "to condition, smooth or make skin appear shiny."[25] PFAS are also added to cosmetics to increase their durability and water resistance."[26]

---

[21] *Dollar Sales Share of the Leading Lip Balm/Treatment Brands in the United States in 2019*, STATISTA, https://www.statista.com/statistics/463377/us-dollar-sales-share-of-leading-lip-balm-treatment-brands/ (last visited July 22, 2022).

[22] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited Nov. 27, 2021).

[23] *Per- and Polyfluoroalkyl Substances (PFAS)*, NATIONAL TOXICOLOGY PROGRAM, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html

[24] *Id.*

[25] Sandee LaMotte, *Makeup may Contain Potentially Toxic Chemicals Called PFAS, Study Finds*, CNN (June 15, 2021, 7:46 PM), https://www.cnn.com/2021/06/15/health/makeup-toxic-chemicals-wellness/index.html.

[26] Heather Whitehead et al., *Fluorinated Compounds in North American Cosmetics*, ENVIRON. SCI. TECHNOL. LETT. (June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240.

55.    By law, all ingredients contained within cosmetics are required to be listed on the product label, in descending order of magnitude.

56.    Common names for PFAS found in cosmetics include PTFE (polytetrafluoroethylene), perfluorooctyl triethoxysilane, perfluorononyl dimethicone, perfluorodecalin, and perfluorohexane.

57.    In order to assess the potential health and environmental risk of PFAS in cosmetics, a study was conducted in June 2021 entitled "Fluorinated Compounds in North American Cosmetics" (the "Study"). The Study analyzed more than 231 cosmetic products purchased in the United States and Canada to determine the presence of PFAS.[27]

58. The Study explained likely reasons for the use of PFAS in makeup[28]:

> PFAS are used in cosmetics due to their properties such hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability. Additional claimed benefits are increased skin absorption of the product and improvements in the appearance or texture of skin.

59.    Despite being required by the US Food and Drug Administration to list all ingredients present in cosmetics, the Study found some 88% of the tested products failed to disclose on their labels any ingredients that would explain those chemical markers.

60.    In order to analyze the presence of PFAS, the Study used a marker for PFAS—the chemical fluorine, which is different than the inorganic fluorine added to drinking water.

61.    "We found fluorine as a surrogate for PFAS was in all sorts of cosmetics. We didn't expect almost every cosmetic to light up like it did," said study author, Graham Peaslee, a professor of physics, chemistry and biochemistry at the University of Notre Dame.[29]

62.    The Study concluded that more than three-quarters of waterproof mascara, nearly two-thirds of foundations and liquid lipsticks, and more than half of eye and lip products had high fluorine concentrations, indicating PFAS were likely present.

---

[27] *Id.*
[28] *Id.*
[29] LaMotte, *supra* note 28.

63.     In addition, samples from 29 of the products with the highest levels of fluorine were sent to an outside lab for an in-depth analysis that could identify 53 specific PFAS chemicals. The analysis found each of those 29 products contained at least four PFAS chemicals of concern.

64.     In 28 of the 29 products—like the PFAS Products here—PFAS chemicals were not disclosed on the label.

65.     Counsel has also further tested some of the Products for organofluorine, which is also an indicator of PFAS, as explained further *infra* ¶ 119.

**III.  Risks Associated with PFAS in Cosmetics**

66.     "PFAS in cosmetics may pose a risk to human health through direct and indirect exposure, as well as a risk to ecosystem health throughout the lifecycle of these products."[30]

67.     Of particular concern with PFAS utilized in cosmetics "is that these classes of cosmetics are applied close to the eyes *and the mouth*, which could increase exposure and hence risk due to enhanced absorption and ingestion."[31]

68.     As skin is the body's largest organ,[32] subjecting it to absorption of PFAS through foundation and concealers is very concerning.

69.     A figure utilized in the Study demonstrates how PFAS in cosmetics are introduced to the human body:



---

[30] Whitehead et al., *supra* note 29.
[31] *Id.* (emphasis added).
[32] Gary Swann, *The Skin is the Body's Largest Organ*, J. OF VISUAL COMM. IN MED. (Volume 33, November 19, 2010), https://doi.org/10.3109/17453054.2010.525439.

70.     As one blogger noted, in quoting a notable dermatologist[33]:

Unfortunately, the technological innovations that PFAS helped create also came with a price: Serious health effects. Jennifer Herrmann, MD, FAAD, a board certified, fellowship-trained dermatologist and dermatologic surgeon at Moy Fincher Chipps Facial Plastics / Dermatology, says that PFAS may impact "increased cholesterol, liver inflammation, increased blood pressure in pregnancy, decreased birth rate of children, decreased vaccine response in children, and increased risk of kidney or testicular cancer."

71.     In 2018, Denmark's EPA performed a "Risk assessment of fluorinated substances in cosmetic products." As noted in the assessment:

This project is part of the Danish Environmental Protection Agency's chemical initiative, with the aim of assessing consumers' exposure to problematic chemistry… The purpose of this project is to build knowledge of fluorinated substances in cosmetic products and to clarify whether the use of cosmetic products containing certain fluorinated substances presents a health risk to consumers. The project focuses on perfluoroalkyl and polyfluoroalkyl substances (PFAS), which are also denoted fluoroalkyl substances. PFAS and other fluorinated compounds are used in a variety of cosmetic products such as foundation, moisturizer, eyeshadow, powder, lipstick and shaving cream.[34]

72.     As the study explained, cosmetics are "'leave-on' products, *i.e.*, they are intended to stay on the skin all day, *with a consequently greater exposure expected compared to other product types that are intended to be washed off immediately after application* ('rinse-off' products)."[35]

73.     The study further noted, "Dermal absorption is set conservatively at 70%. As mentioned earlier, the value is based on a study (Franko et al., 2012) which showed that approximately 25% PFOA (as acid) was absorbed through the skin and that 45% of the substance was retained in the epidermis."[36]

---

[33] Marie Lodi, *"Forever Chemicals" & Cosmetics: What You Need To Know About PFAS*, ROSE INC, https://www.roseinc.com/blogs/education/pfas-forever-chemicals-cosmetics-makeup-explainer?_pos=1&_sid=6962ca83a&_ss=r

[34] Environmental Protection Agency, *Risk Assessment of Fluorinated Substances in Cosmetic Products*, MINISTRY OF ENVIRONMENT AND FOOD OF DENMARK 5, 6 (Oct. 2018), https://www2.mst.dk/Udgiv/publications/2018/10/978-87-93710-94-8.pdf.

[35] *Id.* at 8 (emphasis added).

[36] *Id.* at 11.

74.     In a 2019 study, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS has adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[37]

75.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health"[38]:



76.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[39]

---

[37] *PFAS Explained*, *supra* note 25.
[38] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.
[39] *Id.*

77.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[40]

78.     The danger of PFAS chemicals is well known. On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies," reported on the dangers of PFAS—particularly during gestation and in early childhood development[41]:

> Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity. Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure. Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

79.     Additionally, according to the EEA:

> Costs to society arising from PFAS exposure are high, with the annual health-related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019). The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.[42]

80.     This analysis has yet to be performed in the United States; however, there is no reason to believe the conclusions would differ.

81.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by

---

[40] *What are the health effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited Nov. 27, 2021).

[41] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020, updated Oct. 18, 2021), https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[42] *Emerging chemical risks in Europe — 'PFAS'*, *supra* note 38.

more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[43]

82.    As a result of the risks associated with PFAS, there is a growing consumer advocacy movement to eliminate PFAS from various products, including cosmetics.[44]

83.    In fact, on October 18, 2021, underscoring the gravity of the PFAS threat, the Biden-Harris Administration announced "accelerated efforts to protect Americans from per- and polyfluoroalkyl substances (PFAS), which can cause severe health problems and persist in the environment once released, posing a serious threat across rural, suburban, and urban areas."[45]

**IV.  Burt's Bees Represents That the Products Are Natural**

84.    Defendants are well aware of consumer demand for personal care products that are free from ingredients suspected or known to cause harm to humans and the environment, which is why it has consistently marketed Burt's Bees Products with the Challenged Statements.

85.    These messages are carried through its in-store marketing, official website and online marketing campaign, including its verified Burt's Bees YouTube channel, including as follows[46]:

---

[43]    *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/
[44]    Elicia Mayuri Cousins, et al., *Risky Business? Manufacturer and Retailer Action to Remove Per- and Polyfluorinated Chemicals From Consumer Products*, NEW SOLUTIONS: A J. of Environ. & Occupational Health Policy, 2019, 29(2), 242–65, https://doi.org/10.1177/1048291119852674.
[45]    *FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House, https://bit.ly/3DZvZba
[46]    Burt's Bees, *supra* note 4.

86.     Burt's Bees uses the Challenged Statements in every facet of its marketing, including its social media accounts wherein its accounts' "About" pages state[47]:



[47] Burt's Bees (@burtsbees), FACEBOOK, https://www.facebook.com/burtsbees/; Burt's Bees (@burtsbees), INSTAGRAM, https://www.instagram.com/burtsbees/?hl=en.



87.     Burt's Bees has more than 3 million Facebook followers and 578,000 Instagram followers that it targets with its representations that the ingredients are "responsibly sourced" from "#nature."

88.     With regard to "Responsible Sourcing,"[48] Burt's Bees commits that they "invest globally in communities that support our supply chain, *helping to safeguard access to clean water*, support the empowerment of women and children, and *promote health, safety and biodiversity*."[49]

89.     Burt's Bees claims to "hold ourselves to higher standards and are working to elevate standards across our industry for quality and transparency."[50]  In fact, they likewise claims they are instrumental in the development of the "first and only" standard for the definition of natural ingredients[51]:

---

[48] *Values*, *supra* note 2.

[49] *2020 Impact Report*, BURT'S BEES 13, https://www.burtsbees.com/on/demandware.static/-/Sites-burtsbees-Library/default/dwcf002a3d/redesign/about-us-landing/313081_BB_CORP_SustReport2020_21.02.05.pdf (emphasis added).

[50] *Id.* at 18.

[51] *Id.* at 18. ISO 16128 Scope states that "[t]his document describes approaches to calculate natural, natural origin, organic and organic origin indexes that apply to the ingredient categories defined in ISO 16128-1. This document also offers a framework to determine the natural, natural origin, organic and organic origin content of products based on the ingredient characterization." *Id.*

**ISO 16128 & Natural Origin**

Even with the growth in the natural personal care category, we still lack global regulatory definitions for natural ingredients and products.

*We helped advance the development of the first and only international consensus-based guidelines for natural and organic cosmetic products: International Organization for Standardization (ISO) 16128.*

We believe ISO 16128 will help provide uniform criteria for the industry and we're applying it across our products to guide our calculation of natural origin percentage, which we have long made a point to include on the front our packaging.

90.     Similarly, Burt's Bees goes so far as to represent that it is maintains strict supply chain standards, including third-party auditing and involvement in several supply chain programs and other groups. Specifically, Burt's Bees claims they are "*investing in traceable, transparent* and resilient *supply chains* to support the livelihoods of the people in the communities where we source our ingredients."[52]

91.     In addition to its overall clean and natural beauty campaign, Defendants further claim that the PFAS Products are 100% natural and free of chemicals of concern, even printing "100% natural origin" on the packaging:

---

[52] *Transparency in Natural Beauty*, *supra* note 11.



92.     Further, Burt's Bees also represents with regard to its PFAS Products[53]:

**EXTRA CARE:**
**Responsibly Sourced Waxes, Butters & Oils**

Our 100% natural origin lip care and lip color products are packed with the most nourishing oils, waxes and butters from around the world.

We've made it a priority to connect with the communities who produce these ingredients and invest in supply chain improvements and community empowerment programs.

**We've visited almost all of our wax (96%) and butter (97%) sources—and nearly half of all of our directly purchased wax, butter and oil sources globally.**

---

[53] *2020 Impact Report, supra* note 6 at 15.

93.     The Burt's Bees website reinforces its "clean" and "natural" messaging with a substantial portion of the content dedicated to touting its success as a clean brand and a pioneer in the clean beauty industry.[54] The online marketing is directly demonstrative of the reasonable consumer's expectation when purchasing Burt's Bees—a well-calculated result of its pervasive marketing as a "clean," "natural" brand. It is then no surprise that the reasonable consumer expects the Burt's Bees products to be free from potentially harmful ingredients, such as PFAS, as Burt's Bees reinforces that expectation through its pervasive, uniform marketing campaign.

94.     Based upon Burt's Bees' uniform, pervasive marketing messaging utilizing the Challenged Statements, consumers purchase the PFAS Products expecting they will receive just that—a product free from potentially harmful chemicals. Burt's Bees reinforces that message with, among others, the following representations:

a.     "100% natural" and "100% natural origin;"

b.     Made "without… chemicals of concern";

c.     "ingredients from nature";

d.     "Responsibly sourced";

e.     "consciously crafted with ingredients from nature to nourish and revitalize your skin.";

f.     "clean conscious skin care"; and

g.     "We believe in the power of ingredients from nature to nourish and revitalize skin, which is why we work towards high formula standards, industry transformation, and transparency."[55]

95.     Burt's Bees go farther by representing that the products are environmentally conscious, and that they have the strictest supplier standards including:

a.   "Sustainable Products with Packaging to Match";

---

[54] *The Madrid Statement*, *supra* note 42.
[55]     *83-Year-Old Cosmetics Law Needs a Makeover*, BURT'S BEES, https://www.burtsbees.com/content/personal-care-products/safety-act-and-our-actions.html (last visited July 22, 2022).

b. "We responsibly source the best ingredients from nature to make our products, but we also go the distance to make sure the packages that contain them are as sustainable as possible";

c. "Our product standards reflect our ongoing commitment to the wellbeing of people and the planet";

d. "Responsible Sourcing";

e. "We invest globally in communities that support our supply chain, helping to safeguard access to clean water, support the empowerment of women and children, and promote health, safety and biodiversity";

f. "We've completed more than 100 visits to date to trace and monitor our key raw materials";[56]

g. "We ask tough questions and mentor our suppliers on sustainability improvements; and we do so in order to offer products that truly exemplify The Greater Good®";

h. When evaluating materials related to the "Environment," "We evaluate potential environmental impacts including honeybee health";[57] and

i. "Our approach includes:

   • Business Partner Code of Conduct

   • Supplier Self-Assessments & Site Visits

   • Supplier Sustainability Plans

   • Third-party Audits

   • Ingredient Certification."[58]

96.     The packaging of the Burt's Bees Volumizing Mascara represents that the product is "100% Natural Origin," and the packaging of Burt's Bees Lip Balm represents that the product is "100% Natural," as seen in the images below[59]:

---

[56] *Values*, *supra* note 2.

[57] *From the Source*, BURT'S BEES, https://www.burtsbees.com/content/responsible-sourcing/responsible-sourcing-asset.html (last visited July 22, 2022).

[58] *Id.*

[59] *Burt's Bees 100% Natural Origin Volumizing Mascara, Black Brown*, 0.32 Ounce, Amazon, https://www.amazon.com/Burts-Bees-Natural-Volumizing-Mascara/dp/B07YX9YHYM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





(and *Burt's Bees Beeswax Lip Balm with Vitamin E & Peppermint 0.15 oz (Pack of 6),* Amazon, https://amzn.to/36PXTLo

97.     Plaintiffs, putative Class Members, and consumers saw these "natural" representations and believed that the Products would be free from synthetic chemicals, such as PFAS.

98.     It is obvious from the Burt's Bees website, packaging, and other marketing materials that Burt's Bees' campaign that its products, including the PFAS Products, are (1) 100% natural; (2) free of chemicals of concern; (3) consciously formulated; (4) responsibly sourced; and (5) environmentally sustainable, or what has otherwise been referred to as the Challenged Statements, is pervasive and significant.

99.     The implication of these representations is to convince consumers that Burt's Bees is thoughtful and intentional about not including ingredients in its products that are harmful to humans and the environment.

100.     However, contrary to the Burt's Bees business model and purpose, representations, and consumer expectation of clean products, it sells its Products, which contain PFAS chemicals that are known to be potentially harmful to humans and the environment.

101.     It likewise claims to be instrumental in the development of the ISO standard on natural ingredients and sourcing therefrom: "ISO 16128-2:2017(E): Cosmetics — Guidelines on technical definitions and criteria for natural and organic cosmetic ingredients."

102.     Burt's Bees likewise goes even further by representing that their "product standards will continue to exceed the criteria outlined by ISO 16128."[60] It expands on those representations by stating[61]:

> ISO 16128 provides clear definitions and a way for us to calculate percent natural origin. Then, we build upon that with our own product standards—ingredients we include and don't, a minimum threshold for percent natural origin—along with all of the practices we've cultivated to over the years to respect and honor the relationship between people and the natural world.

103.     Pursuant to ISO standard, 4.3.2 "Natural origin index = 1: Ingredient meets the definition of natural ingredients, constitutive water, reconstitution water, extraction water or

---

[60] *83-Year-Old Cosmetics Law Needs a Makeover*, *supra* note 47.
[61] *Transparency in Natural Beauty*, *supra* note 11.

formulation water. Extracts of natural ingredients using ingredient solvents that are natural or derived natural of wholly natural origin (according to ISO 16128-1:2016, Table A.1) have a natural origin index of 1."

104.    Table A.1 identifies this as follows:

Table 1 — Indexes for the different categories of non-mixture ingredients

| Ingredient category | Index and value | | | |
|---|---|---|---|---|
| | Natural index | Natural origin index | Organic index | Organic origin index |
| Constitutive water | 1 | 1 | 1b | 1b |
| Reconstitution water | 1 | 1 | 1b | 1b |
| Extraction water, with exclusion of reconstitution water | 1 | 1 | 0 | 0 |
| Formulation water | 1 | 1 | 0 | 0 |
| Natural | 1 | 1 | 0 | 0 |
| Natural mineral | 1 | 1 | 0 | 0 |
| Organic | 1 | 1 | 1b | 1b |
| Derived natural | 0 | >0,5 | 0 | 0 |
| Derived organic | 0 | 1 | 0 | To be calculated |
| Derived mineral | 0 | 1 | 0 | 0 |
| Non-natural | 0 | 0 | 0 | 0 |

a Annex A shows sample index values and calculations for derived ingredients.
b Only if the source material is organic. Otherwise, the value is 0.

105.    Further, ISO provides for the determination of "natural" content in finished cosmetics products on a range of 0%-100%, with 100% natural being the maximum, or purest natural content:

> 5 Approaches to determine natural and/or organic content of finished cosmetic products
>
> 5.1 Natural content
>
> 5.1.1 General
>
> The natural content of a product is the mass percentage, between 0 % and 100 %, of all natural ingredients in that product. It is calculated as the sum of the relative concentrations of a product's ingredients multiplied by their corresponding natural indexes.

106.    Similarly, ISO provides for the determination of "natural" *origin* content in finished cosmetics products on a range of 0%-100%, with 100% natural being the maximum, or purest natural content:

> 5.2 Natural origin content
>
> 5.2.1 General
>
> The natural origin content of a product is the mass percentage, between 0 % and 100 %, of all natural ingredients and natural portions of derived natural ingredients in that product. It is calculated as the sum of the relative concentrations of a product's ingredients multiplied by their corresponding natural origin indexes.

107.    As explained by Burt's Bees[62]:

---

[62] *Transparency in Natural Beauty*, *supra* note 4.

UNDERSTANDING **ISO 16128**
& PERCENT NATURAL ORIGIN

According to ISO 16128, **the percentage of natural origin** content is determined by the weight percentage of natural ingredients, and **natural portions** of derived natural ingredients.

**% NATURAL ORIGIN**

**NATURAL INGREDIENTS**

- An ingredient obtained only from plants, animals, micro-biological or mineral sources and not materially altered in processing
- Produced through physical processes, fermentation processes, and traditional solvent extraction
- Examples: Beeswax, Coconut Oil, Willowbark Extract, Lavender Essential Oil, Clay, Mica

**DERIVED NATURAL INGREDIENTS**

- A chemically modified ingredient with greater than 50 percent of starting materials from natural sources, though they can come exclusively from natural materials
- Includes mineral ingredients obtained through chemical processing—these must have the same chemical compositions as naturally occurring mineral ingredients
- Examples: Glycerin, Stearyl Alcohol, Iron Oxides, Titanium Dioxide, Zinc Oxide

108.    According to the Burt's Bees chart, in order to be a natural ingredient, the ingredient must be "obtained on from plants, animals, micro-biological or mineral sources and not materially altered in processing."

109.    While PFAS could arguably be considered a chemical modification of or application on an ingredient, they could not have the "same chemical compositions as naturally occurring mineral ingredients."

110.    Thus, PFAS are chemicals definitionally excluded from being natural, and any product with these man-made chemicals, can likewise not be of 100% natural origin. Thus, the representations that the PFAS Products are "100% natural" or "100% natural origin," or that they exceed the ISO standards Burt's Bees participated in implementing, are patently false.

111.    Reasonable consumers would consider PFAS a harmful chemical and would not expect it would be in the PFAS Products, as evidenced by Defendants' uniform, pervasive marketing campaign aimed at convincing consumers of the Challenged Statements.

112.    Plaintiffs' claims are economic in nature: Plaintiffs and the Classes were injured economically when they purchased the PFAS Products.

113.    As alleged herein, Plaintiffs and putative Class Members received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for the PFAS Products, which were supposed to be clean and natural, but they received neither.

114.    No reasonable consumer would have purchased, or paid as much, for the PFAS Products had they known the products contained harmful ingredients linked to adverse health effects in humans. Even more egregious, Burt's Bees knew that the Products were manufactured with PFAS, but chose not to disclose this material information to their consumers in an effort to persuade them they were, in fact, buying clean and natural products, rather than products containing potentially harmful chemicals. Instead, Defendants deceived consumers by representing that the PFAS Products are clean and/or natural.

115.    No reasonable consumer would expect that a product line marketed as free of chemicals of concern would contain an ingredient like PFAS—which scientific studies indisputably link to harmful health effects in humans. Accordingly, Plaintiffs and class members suffered economic injuries as a result of purchasing the PFAS Products.

**V.  Burt's Bees Products Are Neither "100% Natural" nor of "100% Natural Origin" Because They Contain PFAS Indicators.**

116.    Contrary to Defendants' representations, the Products not natural because they likely contain PFAS, which are a non-natural, synthetic chemicals found to be damaging to both the environment and human health.

117.    PFAS are a family of more than 4,700 highly fluorinated aliphatic compounds manufactured by humans and are known to be damaging to the environment.[63]

118.    Testing conducted on samples of the Products and found ranges from 10 to 207 parts per million (ppm) of fluorine. Fluorine is an indicator that a product contains PFAS.[64]

---

[63] NIEHS, *supra* note 9.

[64] *See, e.g.*, Whitehead et al., *supra* note 3 (PFAS concentrations were detected by screening for total fluorine); *Testing for PFAS in food packaging*, Supply Chains Solutions Center, https://bit.ly/3fNPHwF (last visited Dec. 16, 2021) (recommending that companies screen for PFAS "using a total fluorine method … [that] measures all forms of PFAS"); Jen Dickman et. al., *Packaged in Pollution: Are food chains using PFAS in packaging?,* https://saferchemicals.org/packaged-in-pollution/ (testing for PFAS using total fluorine amounts)

119.    Subsequent testing revealed that almost all of the fluorine detected was organic fluorine; organic fluorine results identify a quantity of organofluorine compounds (*e.g.*, PFAS) and excludes the possibility that fluorine may be present from other or natural sources.[65]

120.    "PFAS in consumer products designed for children under 12 that are intentionally added or present 'at or above 100 part-per-million (ppm), as measured in total organic fluorine,'" (such as Burt's Bees' Volumizing-Mascara, where 206 ppm of organofluorine was detected) have recently been banned by a series of legislative bills in California due to the toxic and environmentally destructive nature of these chemicals.[66]

121.    These results indicate the presence of PFAS in the Products: "Since the world hasn't found a way to test which of 9,000 PFAS are in products, the best current test methods [for PFAS] look for fluorine,"[67] and "when measuring organofluorine in the environment one can assume that it originates from an anthropogenic source."[68]

122.    Thus, by definition, the Products cannot be "100% Natural" or of "100% Natural Origin" because they contain high levels of organofluorine, indicating the presence of PFAS, a synthetic compound.

123.    Further, because they contain PFAS, the Products are not "natural" in any manner that consumers would understand that term to mean.

## VI.  Burt's Bees Representations Mislead Reasonable Consumers.

---

[65] Lara Schultes, et al., *Total Fluorine Measurements in Food Packaging: How Do Current Methods Perform?*, 6(2) Environ. Sci. Technol. Letters 73 (2019).

[66] *California Issues New PFAS Consumer Product Regulations*, Exponent (Oct. 15, 2021), https://www.exponent.com/knowledge/alerts/2021/10/california-issues-new-pfas-consumer-product/?pageSize=NaN&pageNum=0&loadAllByPageSize=true.

[67] Jessian Choy, *New Independent Study Confirms PFAS in Thinx, Other Products*, Sierra Club (Jun. 3, 2021), https://www.sierraclub.org/sierra/ask-ms-green/new-independent-study-confirms-pfas-thinx-other-products.

[68] Alina Koch, et al., *Towards a comprehensive analytical workflow for the chemical characterisation of organofluorine in consumer products and environmental samples*, 123 TrAC Trends in Analytical Chemistry 115423 (2020) ("[N]o single analytical method is versatile and robust enough to identify and quantify the vast number of PFASs, as well as other fluorine-containing agrochemicals or pharmaceuticals that might be present in a sample.").

124.    Reasonable consumers encountering Defendants' representations which emphasize that the Products are natural do not expect the Products to contain PFAS.

125.    Reasonable consumers would consider any product likely to contain PFAS, which are by definition synthetic and manufactured, to be unnatural.

126.    Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold using false and misleading labeling and advertising.

**VII.  Burt's Bees' Representations Are Material to Consumers.**

127.    Consumers care about whether the products they use contain synthetic chemicals, especially if the chemicals are also harmful.[69]

128.    Globally, the clean beauty market is estimated to reach $22 billion by 2024, becoming a fast-growing category within the cosmetics industry.[70] It is no surprise that cosmetic companies, like Burt's Bees, are eager to garner market share in the incredibly lucrative and expanding "clean beauty" movement. In fact, Burt's Bees touts that "more than 22 million households use our products every day."[71]

129.    The clean beauty movement has caused a revolution in the beauty industry, and is the result of increased demand for "clean" products that contribute to the industry's overall health and wellness goals. Over the last 10-15 years, clean beauty products have emerged as key players in the ever-growing cosmetics market, leading companies, such as Burt's Bees, to set themselves apart with attractive marketing claims, even if those claims are unsupported by what is actually in the product.

130.    In a survey of more than 1000 consumers, nearly all participants (98%) indicated they were interested in knowing about the presence of harmful chemicals in everyday products.[72]

---

[69] Wischhover, *supra* note 2.
[70] Kristin Larson, *Shopper Demand for Clean Beauty and Increased Transparency Continues*, FORBES (June 30, 2021, 6:47 PM), https://www.forbes.com/sites/kristinlarson/2021/06/30/shopper-demand-for-clean-beauty-and-increased-transparency-continues/.
[71] *2020 Impact Report*, *supra* note 6 at 18.
[72] Sabrina Hartmann, et al., *Interested Consumers' Awareness of Harmful Chemicals in Everyday Products*, 29 Environ. Sci. Eur. 1, 4 (2017), https://enveurope.springeropen.com/articles/10.1186/s12302-017-0127-8.

131.    When shopping for products, consumers look for "natural" claims due to the belief that "natural" means free from synthetic chemicals.[73]

132.    Additionally, a survey of 15,000 U.S. consumers found that "for younger generations, the biggest consideration when shopping for beauty products was natural, non-toxic ingredients."[74]

133.    Thus, the various natural representations made by Burt's Bees are material to Plaintiffs and other consumers.

134.    Moreover, Defendants know that consumers are focused on what they put on their face – and specifically, their lips, and how the products they use impact the environment.[75]

### TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

135.    Defendants have had actual knowledge for years that the PFAS Products contained potentially harmful chemicals such as PFAS.

136.    Although Burt's Bees was aware of the deception in its labeling given the inclusion of PFAS in its Products, it took no steps to warn  Plaintiffs or Class Members of such PFAS.

137.    Despite its knowledge, Burt's Bees fraudulently concealed the fact that Products contain PFAS. Defendants had a duty to disclose the existence of the PFAS.

138.    Burt's Bees made, and continues to make, affirmative misrepresentations to consumers to promote sales of the PFAS Products that are inconsistent with the Challenged Statements.

139.    Burt's Bees concealed material facts that would have been important to Plaintiffs and putative Class Members in deciding whether to purchase the PFAS Products.  Burt's Bees' concealment  was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and putative Class Members. Accordingly, Plaintiffs and putative Class Members

---

[73] Will Cowling, *Consumers continue to seek products with natural ingredients*, Candy Industry (Jan. 22, 2020), https://www.candyindustry.com/articles/88953-consumers-continue-to-seek-products-with-natural-ingredients ("The research firm found 36 percent of consumers know the [natural] term, used in the food industry to classify products that are . . . free of artificial and synthetic ingredients.").

[74] *State of Smooth Report: Insights from Klarna's 2021 Beauty Survey*, Klarna, https://www.klarna.com/assets/sites/2/2021/03/27044921/The-State-of-Smoooth-Report-Fresh-Faces-Full-Carts-Klarnas-2021-Beauty-Survey-1.pdf

[75] *The Clean Beauty Trend is More Than Skin Deep*, NIELSENIQ (July 29, 2021), nielseniq.com/global/en/insights/education/2021/the-clean-beauty-trend-is-more-than-skin-deep/.

reasonably relied upon Burt's Bees' concealment of these material facts and suffered  injury as a proximate result of that justifiable reliance.

140.    The PFAS in the formulation, design and/or manufacture of the PFAS Products was not reasonably detectible to Plaintiffs and putative Class Members.

141.    At all times, Burt's Bees actively and intentionally concealed the existence of the PFAS and failed to  inform Plaintiffs or putative Class Members of the existence of the PFAS. Accordingly, Plaintiffs and putative Class Members' lack of awareness was not attributable to a lack of diligence on their part.

142.    Burt's Bees' statements, words, and acts were made for the purpose of suppressing the truth that the PFAS Products contained harmful chemicals.

143.    Defendants concealed the PFAS for the purpose of delaying Plaintiffs and putative Class Members from filing a complaint on their causes of action.

144.    As a result of Burt's Bees' active concealment of the PFAS and/or failure to inform Plaintiffs and putative Class Members of the PFAS, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Burt's Bees is  estopped from relying on any statutes of limitations in light of its active concealment of the potentially harmful and/or synthetic nature of the PFAS Products.

145.    Further, the causes of action alleged herein did not occur until Plaintiffs and putative Class Members discovered that the Products contained PFAS. Plaintiffs and putative Class Members had no realistic ability to discern that the Products contained PFAS until they learned of the existence of the PFAS. In either event, Plaintiffs and putative Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the existence and true nature of the PFAS.

### FED. R. CIV. P. 9(b) ALLEGATIONS
**(Affirmative and By Omission)**

146.    Although Burt's Bees is in the best position to know what content was placed on its website(s) and in marketing materials during the relevant timeframe, and the knowledge it had regarding the PFAS and its failure to disclose the existence of PFAS in the Products to consumers,

to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

147.    WHO: Burt's Bees made material misrepresentations and/or omissions of fact through its labeling, website representations, social media, third-party retailers, and marketing statements, which include the Challenged Statements which omitted material information regarding harmful chemicals in the PFAS Products.

148.    WHAT: Burt's Bees' conduct here was, and continues to be, fraudulent because it omitted and concealed that the  Products contains PFAS, an ingredient that Burt's Bees knew would not be deemed clean or natural by Plaintiffs and putative Class Members. Burt's Bees' material misrepresentations to this end, include as follows:

   a.  "100% natural" and "100% natural origin";

   b.  Made "without… chemicals of concern";

   c.  "ingredients from nature";

   d.  "Responsibly sourced";

   e.  "consciously crafted with ingredients from nature to nourish and revitalize your skin.";

   f.  "clean conscious skin care";

   g.  "We believe in the power of ingredients from nature to nourish and revitalize skin, which is why we work towards high formula standards, industry transformation, and transparency";

   h.  "Sustainable Products with Packaging to Match";

   i.  "We responsibly source the best ingredients from nature to make our products, but we also go the distance to make sure the packages that contain them are as sustainable as possible";

   j.  "Our product standards reflect our ongoing commitment to the wellbeing of people and the planet";

   k.  "Responsible Sourcing";

l. "We invest globally in communities that support our supply chain, helping to safeguard access to clean water, support the empowerment of women and children, and promote health, safety and biodiversity";

m. "We've completed more than 100 visits to date to trace and monitor our key raw materials";

n. "product standards will continue to exceed the criteria outlined by ISO 16128";

o. "We ask tough questions and mentor our suppliers on sustainability improvements; and we do so in order to offer products that truly exemplify The Greater Good®";

p. When evaluating materials related to the "Environment," "We evaluate potential environmental impacts including honeybee health"; and

q. "Our approach includes:

- Business Partner Code of Conduct

- Supplier Self-Assessments & Site Visits

- Supplier Sustainability Plans

- Third-party Audits

- Ingredient Certification."

149. Thus, Burt's Bees' conduct deceived Plaintiffs and putative Class Members into believing that the PFAS Products are clean, natural, responsibly sourced, and environmentally sustainable. Burt's Bees knew or should have known this information is material to reasonable consumers, including Plaintiffs and putative Class Members in making their purchasing decisions, yet it continued to pervasively market its PFAS Products as consistent with the Challenged Statements.

150. **WHEN:** Burt's Bees made material misrepresentations and/or omissions during the applicable Class periods and at the time Plaintiffs and putative Class Members purchased the PFAS Products, prior to and at the time Plaintiffs and putative Class Members made claims after realizing the PFAS Products contained harmful chemicals, and continuously throughout the applicable Class periods.

151.    **WHERE:** Burt's Bees' marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of its packaging, its website(s), through marketing materials.

152.    **HOW:** Burt's Bees made material misrepresentations and/or failed to disclose material facts regarding the PFAS Products, including but not limited to the presence of PFAS.

153.    **WHY:** Burt's Bees made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, putative Class Members, and all reasonable consumers to purchase and/or pay for the PFAS Products, the effect of which was that Burt's Bees profited by selling the PFAS Products to many thousands of consumers.

154.    **INJURY:** Plaintiffs and putative Class Members purchased, paid a premium, or otherwise paid more for the PFAS Products when they otherwise would not have absent Defendants' misrepresentations and/or omissions.

## PLAINTIFFS' FACTUAL ALLEGATIONS

**Plaintiff Barrett's Experience**

155.    Plaintiff Tracy Barrett purchased the PFAS Products, including Burt's Bees Lip Shimmer.  She purchased the PFAS Products most recently in Winter 2022, at a CVS near her home in Fresno, California.

156.    Plaintiff Barrett was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Burt's Bees Lip Shimmer.

157.    Before purchasing the PFAS products, Plaintiff Barrett reviewed the products labels and marketing materials, including the "clean" and "100% natural" representations.

158.    Plaintiff Barrett purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals. She wanted a product made from natural ingredients and not harmful chemicals because she wanted to be comfortable reapplying the product frequently. Plaintiff Barrett trusted Burt's Bees advertising and product representations that the PFAS Products consisted of natural ingredients.

159.   Plaintiff Barrett was willing to pay the price she paid for the PFAS Products because she believed their purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

160.   Plaintiff Barrett was specifically drawn to the Burt's Bees product line because of its brand name and clean marketing, which to Plaintiff Barrett meant that the products would be free from harmful chemicals. Plaintiff Barrett has recently recovered from a years-long battle with thyroid cancer. Preceding her diagnosis, and in particular after it, she sought cosmetics products that she believed would support her health and not be potentially harmful to her health. Plaintiff Barrett looked at the product's packaging prior to her purchase, but nowhere on the packaging did Burt's Bees disclose the presence of PFAS chemicals in the PFAS Products nor did Burt's Bees disclose that the products contain harmful chemicals.

161.   If Plaintiff Barrett had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

162.   If Plaintiff Barrett could be reassured that Burt's Bees Products no longer contained PFAS, she would consider purchasing the product again.

163.   As a result of Burt's Bees' action, Plaintiff Barrett has incurred damages, including economic damages due to the breaches. In addition, Burt's Bees' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

**Plaintiff Gruen's Experience**

164.   Plaintiff Daniela Gruen purchased the PFAS Products, including the Burt's Bees Lip Shimmer, the Burt's Bees Lip Shine, the Burt's Bees Lip Gloss, and the Burt's Bees Nourishing Mascara. She purchased the PFAS Products most recently in 2021, at Wegman's in Middlesex County, New Jersey.

165.   Plaintiff Gruen was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Burt's Bees Lip Shimmer, Lip Shine, Lip Gloss, and Nourishing Mascara.

166.    Before purchasing the PFAS Products, Plaintiff Gruen reviewed the products labels and marketing materials, including the clean and 100% natural representations.

167.    Plaintiff Gruen purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals.

168.    Plaintiff Gruen was willing to pay the price she had paid for the PFAS Products because she believed its purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

169.    Plaintiff Gruen was specifically drawn to the Burt's Bees product line because of its brand name and clean marketing, which to Plaintiff Gruen, meant that the products would be free from harmful chemicals. She sought cosmetics for her daily routine, and she believed Burt's Bees was a reputable brand with products made from good, clean and 100% natural ingredients. Plaintiff trusted the Burt's Bees brand so much that she would repeatedly purchase the brand's products. Plaintiff Gruen looked at the product's packaging prior to her purchase, but nowhere on the packaging did Burt's Bees disclose the presence of PFAS chemicals in the PFAS Products nor did Burt's Bees disclose that the product contains harmful chemicals

170.    If Plaintiff Gruen had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

171.    If Plaintiff Gruen could be reassured that Burt's Bees Products no longer contained PFAS, she would consider purchasing the product again.

172.    As a result of Burt's Bees' action, Plaintiff Gruen has incurred damages, including economic damages due to the breaches.  In addition, Burt's Bees' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

**Plaintiff Harman's Experience**

173.    Plaintiff Laura Harman purchased the PFAS Products, including Burt's Bees Beeswax Lip Balm.  She purchased the PFAS Products most recently in April 2021, at Mesick Pharmacy in Mesick, Michigan.

174.    Plaintiff Harman was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Bees Beeswax Lip Balm, Body Lotion, and Nourishing Mascara.

175.    Before purchasing the PFAS Products, Plaintiff Harman reviewed the products labels and marketing materials, including the clean and 100% natural representations.

176.    Plaintiff Harman purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals.

177.    Plaintiff Harman was willing to pay the price she paid for the PFAS Products because she believed its purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

178.    Following Plaintiff Harman's use of the Burt's Bees mascara, she developed shingles, furthering the importance of using makeup products that do not contain potentially harmful chemicals, such as PFAS.  She lives in constant pain due to the consequences of contracting shingles in her eye, which has caused nerve damage in her head. Because of her diagnosis and the pain, she is risk-averse and has stopped using many cosmetics products unless they are natural. Plaintiff Harman looked at the product's packaging prior to her purchase, but nowhere on the packaging did Burt's Bees disclose the presence of PFAS chemicals in the PFAS Products nor did Burt's Bees disclose that the product contains harmful chemicals.

179.    If Plaintiff Harman had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

180.    If Plaintiff Harman could be reassured that Burt's Bees Products no longer contained PFAS, she would consider purchasing the product again.

181.    As a result of Burt's Bees' action, Plaintiff Harman has incurred damages, including economic damages due to the breaches.  In addition, Burt's Bees' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

**Plaintiff Moore-Buice's Experience**

182.    Plaintiff Marilyn Moore-Buice purchased the PFAS Products, including Burt's Bees Lip Balm.  She purchased the PFAS Products most recently in December 2021, at a CVS near her home in Fayetteville, Georgia.

183.    Plaintiff Moore-Buice was familiar with Burt's Bees, and had previously purchased Burt's Bees products, including the Burt's Bees Lip Balm.

184.    Before purchasing the PFAS products, Plaintiff Moore-Buice reviewed the products labels and marketing materials, including the "clean" and "100% natural" representations.

185.    Plaintiff Moore-Buice purchased the PFAS Products based on her belief that the products were clean, natural, and free from harmful chemicals.

186.    Plaintiff Moore-Buice was willing to pay the price she paid for the PFAS Products because she believed its purported "100% natural" and "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

187.    Plaintiff Moore-Buice was specifically drawn to the Burt's Bees product line because of its brand name and clean marketing, which to Plaintiff Moore-Buice, meant that the products would be free from harmful chemicals. She sought a solution for her chapped lips, but she believed Burt's Bees was a reputable brand with products made from good, clean and 100% natural ingredients. Plaintiff trusted the Burt's Bees brand so much that she would purchase the brand's products to give as gifts to her loved ones. Plaintiff Moore-Buice looked at the product's packaging prior to her purchase, but nowhere on the packaging did Burt's Bees disclose the presence of PFAS chemicals in the PFAS Products nor did Burt's Bees disclose that the product contains harmful chemicals.

188.    If Plaintiff Moore-Buice had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Products, she would not have purchased the PFAS Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

189.    If Plaintiff Moore-Buice could be reassured that Burt's Bees Products no longer contained PFAS, she would consider purchasing the product again.

190.    As a result of Burt's Bees' action, Plaintiff Moore-Buice has incurred damages, including economic damages due to the breaches.  In addition, Burt's Bees' conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

**Plaintiff Spindel's Experience**

191.    At all times mentioned herein, Plaintiff Spindel was and is an individual consumer over the age of 18. Within the Class Period, Plaintiffs purchased the Products labeled "100% Natural" or "100% Natural Origin," in retail stores in New York State.

192.    In deciding to make her purchases, Spindel saw, relied upon,[76] and reasonably believed Burt's Bees' "100% Natural" and "100% Natural Origin" representations.

193.    Spindel was willing to pay the requested price for the Products because she expected the Products to have been made without the presence of harmful, synthetic chemicals, such as PFAS.

194.    Had Spindel known at that time that the Products likely contained PFAS, she would not have purchased or continued to purchase the Products.

195.    Spindel continues to purchase cosmetic products, but she does not currently purchase Burt's Bees' products.

196.    Spindel plans to continue purchasing cosmetic products in the future.

197.    Spindel wishes to be able to continue purchasing Burt's Bees' Products and, therefore, wishes to see them definitively made without PFAS. Moreover, Spindel is aware that members of her proposed class are currently purchasing, and will continue to purchase, Burt's Bees' Products, unaware that the "100% Natural" and "100% Natural Origin" representations are not correct, unless Burt's Bees' conduct is enjoined.

198.    On March 1, 2022, Plaintiff Spindel sent a letter via U.S. Certified Mail to Burt's Bees detailing the claims and allegations set forth in this Complaint.

---

[76] Reliance is not an element of claims under New York General Business Law ("N.Y. G.B.L.") §§ 349 & 350. Nevertheless, Plaintiff Spindel did rely on Burt's Bees' representations.

**CLASS ALLEGATIONS**

199.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

200.    Plaintiffs bring the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

201.    Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Nationwide Class:

> **During the fullest period allowed by law, all persons residing in the United States who purchased the PFAS Products.**

202.    Plaintiff Barrett brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following California Subclass:

> **During the fullest period allowed by law, all persons residing in the State of California who purchased the PFAS Products.**

203.    Plaintiff Moore-Buice brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Georgia Subclass:

> **During the fullest period allowed by law, all persons residing in the State of Georgia who purchased the PFAS Products.**

204.    Plaintiff Harman brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Michigan Subclass:

**During the fullest period allowed by law, all persons residing in the State of Michigan who purchased the PFAS Products.**

205.    Plaintiff Gruen brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following New Jersey Subclass:

**During the fullest period allowed by law, all persons residing in the State of New Jersey who purchased the PFAS Products.**

206.    Plaintiff Spindel brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following New York Subclass:

**During the fullest period allowed by law, all persons residing in the State of New York who purchased the PFAS Products.**

207.    Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

208.    Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional products with the same PFAS and/or other makeup products manufactured by Defendants with PFAS but bearing different brand names, or if further information and discovery indicate that the Class definitions should be otherwise modified.

209.    All members of the Class were and are similarly affected by the deceptive labeling and advertising of Burt's Bees' Products, and the relief sought herein is for the benefit of Plaintiffs and members of the Class**.**

210.    **Numerosity:** At this time, Plaintiffs do not know the exact number of Class members. Based on the wide distribution of Burt's Bees' Products throughout the United States, and in

California, Georgia, Michigan, and New York. Plaintiffs believe that the Class comprises many thousands of consumers. The number of consumers in the Class is so large as to make joinder impracticable, if not impossible. Class Members are readily identifiable from information and records in the possession of Defendants and its authorized distributors and retailers. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

211.    **Commonality and Predominance:** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include (a) whether Burt's Bees is responsible for the labeling and advertising at issue; (b) whether the labeling and advertising of the Products was unfair, false, deceptive, fraudulent and/or unlawful; (c) whether Burt's Bees breached a warranty created through the labeling and marketing of its Products; and (d) whether Burt's Bees' conduct as set forth above injured, and may continue to injure, Plaintiffs and Class members.

212.    **Typicality:**  Plaintiffs' claims are typical of those of the Class, as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members. Plaintiffs, like all members of the Class, relied[77] on Burt's Bees' false and misleading representations and purchased Burt's Bees' Products, or purchased more of them, or paid more for the Products than they would have paid if the products had been properly labeled, and sustained injury from Burt's Bees' wrongful conduct. Further, there are no defenses available to Burt's Bees that are unique to Plaintiffs.

213.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, and they have retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class Members. Undersigned counsel has

---

[77] Reliance is not an element of claims under N.Y. G.B.L. §§ 349 & 350. Nevertheless, the "natural" representations were made prominently and uniformly on each Product so that they would be seen prior to purchase.

represented consumers in a variety of actions seeking to protect consumers from fraudulent and deceptive practices.

214. **Superiority:** The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each Class Member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

215. Individual joinder of the Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class Members. Each Class Member has been damaged and is entitled to recovery as a result of the violations alleged herein.

216. Moreover, because the damages suffered by Class Members may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

217. Plaintiffs are unaware of any difficulties in managing this case that would preclude proceeding as a class action.

218. Certification also is appropriate under Rule 23(b)(2) because Burt's Bees acted, or refused to act, on grounds generally applicable to the Class.

219. Further, given the large number of consumers of Burt's Bees' Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

## COUNT I

**Breach of Express Warranty**
**(On Behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

220.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-219 regarding the potentially harmful nature of PFAS and Defendants' deceptive representations,  as though fully set forth herein.

221.    Plaintiffs and putative Class Members purchased the PFAS Products either directly from Defendants or through retailers, such as CVS and Walgreens.

222.    Defendants are and were at all relevant times a "merchant" under U.C.C. § 2-313, and related State U.C.C. provisions.

223.    In connection with their sale of the PFAS Products, Defendants, as the designers, manufacturers, marketers, distributors or sellers, expressly warranted that the PFAS Products were free from harmful chemicals by naming the product line "Burt's Bees."

224.    As detailed herein, Defendants engaged in a uniform, pervasive marketing campaign and expressly warranted to consumers that the PFAS Products conform to the Challenged Statements, among other substantially similar representations made online, and on its packaging.

225.    The express written warranties covering the PFAS Products were a material part of the bargain between Defendants and consumers. At the time they made these express warranties, Defendants knew reasonable consumers were purchasing the PFAS Products because they believed the products to be as labeled and marketed.

226.    Each of the PFAS Products have an identical or substantially identical product representation(s) as they each contain the product name Burt's Bees.

227.    Defendants breached their express warranties by selling the PFAS Products that were, in actuality, not free harmful chemicals like PFAS, as promised in the labeling and marketing. Defendants breached the warranty because the PFAS Products are not consistent with the Challenged Statements, and which was known to Defendants and unknown to consumers at the time of sale.

228.    Defendants breached their express warranty to products consistent with the Challenged Statements, despite the availability of alternative formulations, designs, materials, and/or options for manufacturing the PFAS Products.

229.    Defendants further breached their express written warranties to Plaintiffs and putative Class Members in that the PFAS Products contain harmful chemicals at the time they leave the manufacturing plant, and on the first day of purchase, and by failing to disclose and actively concealing this risk from consumers.

230.    The PFAS Products that Plaintiffs and putative Class Members purchased contained PFAS chemicals that are neither clean nor natural, and therefore experienced loss of the product, loss of use of the product, and loss of the benefit of their bargain. Defendants' warranty expressly applies to the original purchaser and any succeeding owner of the PFAS Products for products purchased within the USA, creating privity between Defendants on the one hand, and Plaintiffs and putative Class Members on the other.

231.    Likewise, it was reasonably foreseeable that Plaintiffs and putative Class Members would be the intended beneficiaries of the PFAS Products and warranties, creating privity or an exception to any privity requirement. Plaintiffs and each of the putative Class Members are the intended beneficiaries of Defendants' warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the PFAS Products and have no rights under the warranty agreements provided by Defendants. Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiffs and putative Class Members were the intended beneficiaries of the PFAS Products.

232.    Defendants have been provided sufficient notice of its breaches of the express warranties associated with the PFAS Products.

233.    On March 1, 2022, in accordance with UCC § 2-607, Plaintiffs provided Defendants with written notice of the breaches of warranty described herein via US Mail.  Defendants have refused to redress the aforementioned breaches.

234.    Upon information and belief, Defendants received further notice and have been on notice of their breach of warranties through their sale of PFAS Products and of their breaches of

warranties through customer warranty claims reporting problems with Defendants, consumer complaints at various sources, and their own internal and external testing.

235.    As a direct and proximate result of Defendants' breach of its express written warranties, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT II

### Breach of Implied Warranty
### (On Behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)

236.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

237.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class or, in the alternative, the State Subclasses.

238.    Defendants are merchants and were at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the PFAS Products.

239.    The PFAS Products are goods within the relevant laws and Defendants knew or had reason to know of the specific use for which the PFAS Products, as goods, were purchased.

240.    The implied warranty of merchantability included with the sale of the PFAS Products means that Defendants warranted that the PFAS Products would be fit for the ordinary purposes for which the PFAS Products were used and sold, and were not otherwise injurious to consumers, that the PFAS Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendants. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendants, and Plaintiffs and putative Class Members.

241.    Defendants breached the implied warranty of merchantability because the PFAS Products are not fit for their ordinary purpose of providing reasonably clean, "100% natural," "100% natural original," environmentally sustainable," free of "chemicals of concern," the PFAS Products contain potentially harmful chemicals which could not reasonably be characterized as clean or natural.

242.    The aforementioned problems associated with the PFAS Products constitute non-clean, unnatural, not responsibly sourced, or environmentally sustainable makeup products, and therefore, there is a breach of the implied warranty of merchantability.

243.    Defendants' warranty expressly applies to the original purchaser and any succeeding owner of the PFAS Products, creating privity between Defendants on the one hand, and Plaintiffs and putative Class Members on the other.

244.    Nonetheless, privity is not required because Plaintiffs and putative Class Members are the intended beneficiaries of Defendants' warranties and its sale through retailers. Defendants' retailers were not intended to be the ultimate consumers of the PFAS Products and have no rights under the warranty agreements. Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiffs and putative Class Members were their intended beneficiaries.

245.    More specifically, Defendants' intention that its warranties apply to Plaintiffs and putative Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and putative Class Members would be the intended beneficiaries of the PFAS Products and warranties.

246.    Defendants impliedly warranted that the PFAS Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Makeup manufactured, supplied, distributed, and/or sold by Defendants were clean, "100% natural," "100% natural original," environmentally sustainable," and free of "chemicals of concern;" and (ii) a warranty that the PFAS Products would be fit for their intended use while they were being used by consumers.

247.    Contrary to the applicable implied warranties, the PFAS Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and putative Class Members with clean and natural makeup. Instead, the PFAS Products suffered, and continue to suffer, from a formulation, design and/or manufacture defect, as alleged herein.

248.    Defendants breached the implied warranties because the PFAS Products were sold with PFAS, which substantially reduced and/or prevented the PFAS Products from being clean and natural.

249.    As a direct and proximate result of the foregoing, Plaintiffs and putative Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT III
### Negligent Misrepresentation
### (On behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)

250.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

251.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class or, in the alternative, the State Subclasses.

252.    Pursuant to California law, Plaintiffs must prove the following for a negligent misrepresentation claim: (1) a false statement of a material fact; (2) Defendant's knowledge that the statement was false; (3) Defendant's intent that the statement induce plaintiffs to act; (4) Plaintiffs' reliance upon the truth of the statement; and (5) Plaintiffs' damages resulting from reliance on the statement.

253.    As a seller of the PFAS Products and a merchant, Defendants had a duty to give correct information to Plaintiffs and putative Class Members regarding the truth and accuracy of the ingredients of the PFAS Products. Defendants had sole possession and control of this information and had a duty to disclose it accurately to Plaintiffs and putative Class Members.

254.    Defendants represented that the PFAS Products conformed to the Challenged Statements when in reality, studies and testing have shown that they contained potentially harmful ingredients. Defendants knew, or should have known, that the PFAS Products contained non-clean and/or non-natural ingredients.

255.    That the PFAS Products were not consistent with the Challenged Statements was known by Defendants, and unknown to Plaintiffs and putative Class Members, and was intended to induce Plaintiffs and Class Members to purchase the PFAS Products. Defendants knew that making these representations would induce customers to purchase its makeup over the makeup of competitors.

256.    The Plaintiffs and putative Class Members relied upon the Defendants' representations that the PFAS Products was "clean" and "natural" when purchasing the PFAS Products. Further, this reliance was in fact to their detriment because the Plaintiffs and putative Class Members purchased the PFAS Products with harmful chemicals.

257.    Plaintiffs and putative Class Members are entitled to all relief the Court proper as a result of Defendants' actions described herein.

**COUNT IV**
**Fraud**
**(On behalf of Plaintiffs and the Nationwide Class and,**
**In the Alternative, the State Subclasses)**

258.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

259.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class or, in the alternative, the State Subclasses.

260.    Defendants knew or should have known that the PFAS Products contained potentially harmful ingredients, including PFAS chemicals.

261.    Defendants provided Plaintiffs and Nationwide Class Members with false or misleading material information and failed to disclose material facts about the true nature of the PFAS Products, including the Challenged Statements.

262.    Defendants had exclusive knowledge of the PFAS Products' ingredients at the time of sale and at all other relevant times. Neither Plaintiffs nor Nationwide Class Members, in the exercise of reasonable diligence, could have independently discovered the true nature of the PFAS Products prior to purchase.

263.    Defendants had the capacity to, and did, deceive Plaintiffs and Nationwide Class Members, into believing they were purchasing products which conformed to the Challenged Statements.

264.    Defendants undertook active and ongoing steps to conceal the presence of PFAS chemicals in the Products. Plaintiffs are not aware of anything in Defendants' advertising, publicity,

or marketing materials that disclosed the truth about the PFAS Products, despite Defendants' awareness of the problem.

265.    The facts concealed and/or not disclosed by Defendants to Plaintiffs and Nationwide Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or pay the same price for) the PFAS Products.

266.    Defendants intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and Nationwide Class Members to act thereon.

267.    Plaintiffs and Nationwide Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the PFAS Products.

268.    Plaintiffs and Nationwide Class Members suffered a loss of money in an amount to be proven at trial as a result of Defendants' fraudulent concealment and nondisclosure because they would not have purchased the PFAS Products, or would not have purchased the PFAS Products for the price they did, if the true facts concerning the PFAS Products had been known.

269.    Plaintiffs and Nationwide Class Members are entitled to all relief the Court proper as a result of Defendants' actions described herein.

## COUNT V

**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of Plaintiff Barrett and the Nationwide Class and, Alternatively, the California Subclass)**

270.    Plaintiff Barrett hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

271.    Plaintiff Barrett brings this claim individually and on behalf of the Nationwide Class or, in the alternative, the California Subclass.

272.    The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq*.

273.     The CLRA applies to all claims of Plaintiff Barrett and putative Subclass Members because the conduct which constitutes violations of the CLRA by Defendants occurred within the State of California.

274.     Plaintiffs Barrett and putative Subclass Members are "consumers" as defined by Civil Code § 1761(d).

275.     Defendants are a "person" as defined by California Civil Code § 1761(c).

276.     The PFAS Products qualifies as "goods" as defined by California Civil Code § 1761(a).

277.     Plaintiff Barrett and the putative Subclass Members' purchases of the PFAS Products are "transactions" as defined by California Civil Code § 1761(e).

278.     As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer unlawful:

a.     "Representing that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do no have." Civil Code § 1770(a)(5); and

b.     "Representing that goods . . . are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

279.     Defendants engaged in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when it represented, through its advertising and other express representations, that the PFAS Products had benefits or characteristics that it did not actually have.

280.     As detailed in the body of this Complaint, Defendants have repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the PFAS Products' benefits or characteristics that it did not in fact have, and has represented the PFAS Products to be of a quality that it was not. Indeed, Defendants concealed this information from Plaintiff Barrett and putative Subclass Members.

281.    The PFAS Products was not and is not "clean" or "natural" for consumers. As detailed above, Defendants violated the CLRA when they falsely represented that the PFAS Products meet a certain standard or quality.

282.    Defendants further violated the CLRA when they advertised the PFAS Products with the intent not to sell the products as advertised, and knew that the PFAS Products were not as represented.

283.    Specifically, Defendants marketed and represented the PFAS Products, *inter alia*, as being "free of harsh chemicals and unnecessary additives," "clean," and "pure" when in fact the PFAS Products contain PFAS chemicals known to be potentially harmful to humans.

284.    Defendants' deceptive practices were specifically designed to induce Plaintiff Barrett and putative Subclass Members to purchase or otherwise acquire the PFAS Products.

285.    Defendants engaged in uniform marketing efforts to reach Plaintiff Barrett and putative Subclass Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the PFAS Products manufactured by Defendants. Defendants' packaging, advertising, marketing, website, and retailer product identification and specifications contain numerous false and misleading statements regarding the quality and ingredients of the PFAS Products. These include, *inter alia*, the following misrepresentations contained in its advertising, marketing, social media platforms, and website:

- "100% NATURAL ORIGIN";
- "100% natural original";
- "Ingredients from nature";
- "clean conscious skin care";
- "Responsible sourcing";
- "[C]onsciously crafted with ingredients from nature to nourish and revitalize your skin";
- "[W]ithout...chemicals of concern";
- "Our products are made with ingredients from nature with responsible sourcing, no animal testing, and recyclable packaging";

- "Our ingredients—right down to the packaging—are simple, natural, and responsible. We practice what we preach—and we hope to set the example for others to follow. We care deeply for the earth and all its people";

- "Sustainable Products with Packaging to Match";

- "We choose the best and most powerful ingredients from nature to formulate our products, so it's incumbent upon us to find ways to give back and preserve nature's incredible diversity, vitality and beauty";

- "We hold ourselves to higher standards and are working to elevate standards across our industry for quality and transparency";

- "We've completed more than 100 visits to date to trace and monitor our key raw materials";

- "We helped advance the development of the first and only international consensus-based guidelines for natural and organic cosmetic products";

- "Our product standards reflect our ongoing commitment to the wellbeing of people and the planet";

- "We invest globally in communities that support our supply chain, helping to safeguard access to clean water, support the empowerment of women and children, and promote health, safety and biodiversity";

- "We ask tough questions and mentor our suppliers on sustainability improvements; and we do so in order to offer products that truly exemplify The Greater Good®";

286.   Despite these representations, Defendants omitted and concealed information and material facts from Plaintiff Barrett and putative Subclass Members.

287.   In their purchase of the PFAS Products, Plaintiff Barrett and putative Subclass Members relied on Defendants' representations and omissions of material facts.

288.   These business practices are misleading and/or likely to mislead consumers and should be enjoined.

289.   In accordance with California Civil Code § 1780(a), Plaintiff Barrett and the putative Subclass Members seek injunctive and equitable relief for Defendants' violations of the CLRA,

**Case 3:22-cv-00935-RS   Document 26   Filed 07/27/22   Page 55 of 72**

including an injunction to enjoin Defendants from continuing their deceptive advertising and sales practices.

290.    Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff Barrett and putative Subclass Members seek an order enjoining Defendants from the unlawful practices described above, a declaration that Defendants' conduct violates the Consumer Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

291.    Plaintiff Barrett and putative Subclass Members will amend their Complaint to add claims for monetary damages if Defendants fail to take corrective actions.

## COUNT VI

### Violations of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On Behalf of Plaintiff Barrett and the Nationwide Class and, Alternatively, the California Subclass)

292.    Plaintiff Barrett hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

293.    Plaintiff Barrett brings this count on behalf of herself and the California Subclass.

294.    Defendants are a "person" as defined by Cal. Bus. & Prof. Code § 17201.

295.    Plaintiff Barrett and California Subclass Members who purchased the Defendants' PFAS Products suffered an injury by virtue of buying products in which Defendants misrepresented and/or omitted the PFAS Products' true quality and ingredients. Had Plaintiff Barrett and California Subclass Members known that Defendants materially misrepresented the PFAS Products and/or omitted material information regarding its PFAS Products and its ingredients, they would not have purchased the PFAS Products.

296.    Defendants' conduct, as alleged herein, violates the laws and public policies of the state of California and the federal government, as set out in the preceding paragraphs of this complaint.

297.    There is no benefit to consumers or competition by allowing Defendants to deceptively label, market, and advertise its PFAS Products.

CONSOLIDATED AMENDED COMPLAINT- 55

298.     Plaintiff Barrett and California Subclass Members who purchased Defendants' PFAS Products had no way of reasonably knowing that the PFAS Products were deceptively packaged, marketed, advertised, and labeled; were not clean, 100% natural and not made without chemicals of concern; and were unsuitable for their intended use. Thus, Plaintiff Barrett and California Subclass Members could not have reasonably avoided the harm they suffered.

299.     Specifically, Burt Bee's marketed, labeled, and represented the PFAS Products as the Challenged Statements, when in fact the PFAS Products contain potentially harmful, human made, PFAS chemicals.

300.     The gravity of harm suffered by Plaintiff Barrett and California Subclass Members who purchased the PFAS Products outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and/or labeling the PFAS Products in a deceptive and misleading manner. Accordingly, Defendants' actions are immoral, unethical, unscrupulous, and offend the established public policies of the state of California and the federal government. Defendants' actions are substantially injurious to Plaintiff Barrett and California Subclass Members.

301.     The above acts of Defendants in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Barrett and California Subclass Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendants' PFAS Products, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

302.     As a result of Defendants' unlawful, unfair and fraudulent acts and practices, Plaintiff Barrett on behalf of herself and the California Subclass, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendants from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendants' wrongful conduct to the fullest extent permitted by law.

## COUNT VII

**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of Plaintiff Barrett and the Nationwide Class and, Alternatively, the California Subclass)**

303.     Plaintiff Barrett hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

304.     Plaintiff Barrett brings this count on behalf of herself and the California Subclass.

305.     The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

306.     The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

307.     It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

308.     Defendants, when they marketed, advertised, and sold the PFAS Products, represented to Plaintiff Barrett and California Subclass Members that they were Burt Bee's marketed, labeled, and represented the PFAS Products as consistent with the Challenged Statements when in fact the PFAS Products contain potentially harmful, human made, PFAS chemicals.

309.     At the time of its misrepresentations, Defendants were either aware that the PFAS Products contained PFAS chemicals and were not clean or natural, or they were aware that they lacked the information and/or knowledge required to make such a representation truthfully.

310.     Defendants concealed, omitted, or otherwise failed to disclose this information to Plaintiff Barrett and California Subclass Members.

311.     Defendants' descriptions of the PFAS Products were false, misleading, and likely to deceive Plaintiff Barrett and other reasonable consumers.

312.     Defendants' conduct therefore constitutes deceptive or misleading advertising under the FAL.

313.     Plaintiff Barrett has standing to pursue claims under the FAL as she reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the PFAS Products when selecting and purchasing the PFAS Products.

314.     In reliance on the statements made in Defendants' advertising and marketing materials, and Defendants' omissions and concealment of material facts regarding the quality and use of the PFAS Products, Plaintiff Barrett and the California Subclass Members purchased the PFAS Products.

315.     Had Defendants disclosed the true nature of the PFAS Products, specifically, the presence of PFAS chemicals therein, Plaintiff Barrett and California Subclass Members would not have purchased the PFAS Products or would have paid substantially less for it.

316.     As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Barrett and California Subclass Members who paid for the PFAS Products containing PFAS chemicals.

317.     Plaintiff Barrett and California Subclass Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendants by means of its deceptive or misleading representations, including monies already obtained from Plaintiff Barrett and California Subclass Members as provided for by the Cal. Bus. & Prof. Code § 17500.

## COUNT VIII

### Violation of the Georgia Fair Business Practices Act
### O.C.G.A. § 10-1-390, *et seq.*
### (Plaintiffs Moore-Buice Individually and Behalf of the Georgia Subclass)

318.     Plaintiff Moore-Buice hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

319.     The conduct described herein constitutes deceptive acts and practices, which were directed at consumers, and are violations of Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.* ("FBPA").

320.     Burt's Bees' foregoing deceptive acts and practices, including their omissions, were material, in part, because they concerned an essential part of the Products at issue. Specifically, when Burt's Bees marketed, advertised and sold the PFAS Products, represented to Plaintiff Moore-Buice and Georgia Subclass Members that the PFAS Products conformed to the Challenged Statements when in fact the PFAS Products contains potentially harmful, human made, PFAS chemicals. These omissions and representations were material facts to Plaintiff Moore-Buice and Georgia Subclass Members when selecting the PFAS Products.

321.     At the time of its misrepresentations and omissions, Defendants were either aware that the PFAS Products contain PFAS, or were aware that they lacked the information and/or knowledge required to make such a representation truthfully. Defendants concealed, omitted and failed to disclose this information to Plaintiff Moore-Buice and Georgia Subclass Members.

322.     Rather than disclose their knowledge that PFAS was in the Products, Defendants engaged in and continued a widespread uniform, marketing, and advertising campaign that misrepresented the PFAS Products as the Challenged Statements.

323.     Defendants' descriptions and advertisements of the PFAS Products were false, misleading, and likely to deceive Plaintiff Moore-Buice and other reasonable consumers.

324.     The FBPA declares unlawful any "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." O.C.G.A. § 10-1-393.

325.     Included in unlawful conduct under the FBPA is "Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;" O.C.G.A. § 10-1-393(b)(7).

326.     Defendants are "persons" as defined by ty O.C.G.A. § 10-1-392.

327.     Plaintiff Moore-Buice and Georgia Subclass Members are consumers as defined by O.C.G.A. § 10-1-392.

328.   Defendants' sale of the PFAS Products is a "consumer transaction," and is "trade" and "commerce" as defined by O.C.G.A. § 10-1-392.

329.   The PFAS Products are "goods" within the meaning of O.C.G.A. § 10-1-390, *et seq.*

330.   Defendants engaged in unfair and deceptive trade practices through the following conduct:

   a.   Having extensive knowledge of the harmful nature of the PFAS Products and failing to disclose to Plaintiff Moore-Buice and Georgia Subclass Members;

   b.   Representing the PFAS products were consistent with the Challenged Statements; and

   c.   In failing to disclose to the Plaintiff Moore-Buice and Georgia Subclass Members that the PFAS Products were inconsistent with the Challenged Statements.

331.   Defendants' conduct caused actual confusion and actual misunderstanding with Plaintiff Moore-Buice and Georgia Subclass Members, in that they believed they were purchasing and using PFAS Products conforming to the Challenged Statements.

332.   In fact, Defendants' statements were false and misleading in that the PFAS Products are not the Challenged Statements. Had Plaintiff Moore-Buice and Georgia Subclass Members known Burt's Bees' statements were false or misleading, they would not have purchased the PFAS Products.

333.   As a proximate consequence of Burt's Bees' improper conduct, Plaintiff Moore-Buice and Georgia Subclass Members were injured, including not receiving the value of the product they purchased and loss of the PFAS Products.

334.   Plaintiff Moore-Buice and Georgia Subclass Members suffered damages when they purchased the PFAS Products.  Defendants' unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Moore-Buice and Georgia Subclass Members who were unaware that the PFAS Products contained harmful PFAS chemicals.

335.   Plaintiff Moore-Buice and Georgia Subclass Members seek all relief available under the law, including injunctive, declaratory relief, and any other relief the Court deems appropriate.

Plaintiff Moore-Buice and Georgia Subclass Members will amend their Complaint to add claims for monetary damages if Defendants fail to take corrective actions.

## COUNT IX

**Violation of Georgia's Uniform Deceptive Trade Practices Act**
**(O.C.G.A. § 10-1-370, *et seq.*)**
**(Plaintiffs Moore-Buice Individually and Behalf of the Georgia Subclass)**

336.    Plaintiff Moore-Buice hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

337.    Defendants, Plaintiff Moore-Buice, and Georgia Subclass Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). O.C.G.A. § 10-1-371(5).

338.    The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusing or misunderstanding," and representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-372.

339.    By misrepresenting that the PFAS Products are the Challenged Statements and otherwise failing to disclose the nature of the PFAS Products to Plaintiff Moore-Buice and Georgia Subclass Members, Defendants engaged in deceptive trade practices in violation of the Georgia UDTPA, because Defendants represented that the PFAS Products had characteristics and benefits that they do not have, and represented that the PFAS Products were of a particular standard, quality, or grade  when they were of another. See O.C.G.A. §§ 10-1-372(5), (7), (9).

340.    Defendants advertised the PFAS Products as the Challenged Statements with the intent not to sell it as advertised given its knowledge they contained harmful PFAS chemicals, in violation of O.C.G.A. §10-1-372.

341.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the

purchasing public, and as a result, caused economic harm on owners and purchasers of the PFAS Products.

342.    Defendants knew or should have known before Plaintiff Moore-Buice and Georgia Subclass Members purchased their PFAS Products, that the PFAS Products contained PFAS, were not consistent with the Challenged Statements, and otherwise were not suitable for their intended use.

343.    Defendants had exclusive knowledge of material facts concerning the existence of PFAS in the Products and that the PFAS Products are not as represented; however, Defendants actively concealed the PFAS from consumers by continuing to represent the PFAS Products to be the Challenged Statements.

344.    Defendants were under a duty to Plaintiff Moore-Buice and Georgia Subclass Members to disclose the PFAS in the Products because, *inter alia*, Defendants were in a superior position to know the true state of facts about the chemicals and ingredients in its Products.

345.    Plaintiff Moore-Buice and Georgia Subclass Members could not reasonably have been expected to learn or discover that the PFAS Products had PFAS and did not conform to the Challenged Statements.

346.    Despite possessing information to the contrary, Defendants misrepresented the PFAS Products as the Challenged Statements, and otherwise failed to disclose and actively concealed the PFAS while continuing to market and sell the PFAS Products.

347.    Defendants knew or should have known that its conduct violated the Georgia UDTPA.

348.    In misrepresenting the PFAS Products as the Challenged Statements and failing to disclose the PFAS in the Products, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

349.    The facts Defendants misrepresented to, and concealed from, Plaintiff Moore-Buice and Georgia Subclass Members were material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase the PFAS Products. Moreover, a reasonable consumer would consider the PFAS in the products to be an undesirable quality, as

Plaintiff Moore-Buice and Georgia Subclass Members did. Had Plaintiff Moore-Buice and Georgia Subclass Members known that the PFAS Products contained PFAS, they would not have purchased the PFAS Products, or would have paid less for them.

350.    As a result of Defendants' misconduct, Plaintiff Moore-Buice and Georgia Subclass Members have been harmed and suffered actual damages in that the PFAS Products are not the Challenged Statements.

351.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Moore-Buice and Georgia Subclass Members have suffered and will continue to suffer actual damages.

352.    Defendants' violation presents a continuing risk to Plaintiff Moore-Buice and Georgia Subclass Members and the general public, as they continue to make some representations that the PFAS Products consistent with the Challenged Statements.  Defendants' unlawful acts and practices complained of herein affect the public interest.

353.    As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiff Moore-Buice and Georgia Subclass Members have suffered injury-in-fact and/or actual damage.

354.    Plaintiff Moore-Buice and Georgia Subclass Members seek an order enjoining Burt's Bees' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

## COUNT X

### Violation of the Michigan Consumer Protection Act,
### Mich. Comp. Laws Ann. §§ 445.903, *et seq.*
### (Plaintiffs Harman Individually and Behalf of the Michigan Subclass)

355.    Plaintiff Harman hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

356.    Plaintiff Harman, the Michigan Subclass, and Defendants are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

357.    Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

358.    Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a.    Representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c); Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

b.    Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

c.    Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

359.    Defendants' unfair, unconscionable, and deceptive practices include:

a.    Representing that the PFAS Products were the Challenged Statements, when they contained chemicals harmful to the human body and the environment; and

b.    Omitting, suppressing, and concealing the material fact that the Products contain harmful PFAS chemicals.

360.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the safety and sustainability of the PFAS Products.

361.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff Harman and Michigan Subclass Members, that the Products are consistent with the Challenged Statements when they are not.

362.    Defendants intended to mislead Plaintiff Harman and Michigan Subclass Members and induce them to rely on the misrepresentations and omissions.

363.    Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiff Harman and Michigan Subclass Members' rights.

364.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, Plaintiff Harman and Michigan Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

365.    Plaintiff Harman and Michigan Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

## COUNT XI

### Violation Of New Jersey Consumer Fraud Act
### N.J Stat. Ann. § 56:8-1, et sec.
### (On Behalf of Plaintiffs and the New Jersey Subclass)

366.    Plaintiff Gruen hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

367.    Defendants' representations related to the Products, as described herein, are advertisements as defined by N.J. Stat. Ann. §56:8-1(a).

368.    The Products sold by Defendants is merchandise as defined in N.J. Stat. Ann. §56:8-1(c).

369.    Defendants are persons as defined in N.J. Stat. Ann. §56:8-1(d).

370.    Defendants misrepresented the true quality and ingredients of the Products. The false statements regarding the quality and ingredients were untrue, misleading, and deceptive, inducing Plaintiff Gruen and the New Jersey Subclass to spend more for Products that have lower quality than represented.

371.    The misrepresented quality and ingredients of the Products is a material fact to Plaintiff Gruen and the New Jersey Subclass because it is directly related to quality, and because Defendants recognize the materiality as evidenced by their prominent placement on Defendants' labels, packaging, and advertising.

372. Defendants failed to disclose the presence of PFAS in the Products. These were material facts that Defendants omitted from the packaging of the Products. Consumers, including Plaintiff Gruen and the New Jersey Subclass, would not have paid as much for the Products had Defendants accurately disclosed the quality and ingredients of the Products. Nor could Defendants charge as much for such Products, as the quality and ingredients are directly related to the amount of money retailers are able to charge for Products.

373. Defendants placed the false quality in labels, packaging, and advertising related to the Products, intending that consumers would rely on those misrepresentations and purchase the Products from Defendant. Plaintiff Gruen and the New Jersey Subclass were harmed by Defendant's misrepresentations and purchased the Products. Had Defendant disclosed the true quality and contents, Plaintiff Gruen and members of the New Jersey Subclass would not have purchased the Products or would not have been willing to pay as much for the Products.

374. Plaintiff Gruen and New Jersey Subclass have suffered an ascertainable loss by paying more than they would have otherwise paid –and more than Defendants would have been able to charge –for the Products and by receiving Products with lower quality than they were promised by Defendants and thus being denied the benefit of their bargain.

375. As a direct and proximate result of the deceptive, fraudulent, misleading, unfair, and unconscionable practices of the Defendants set forth above, Plaintiff Gruen and the New Jersey Subclass are entitled to a refund of all moneys acquired by Defendants for violations of N.J. Stat. Ann. § 56:8-1, any other applicable legal or equitable relief, and treble damages.

## COUNT XII

### Violation Of New York General Business Law § 349
### (On Behalf of Plaintiffs and the New York Subclass)

376. Plaintiff Spindel hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

377. The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

378.   Burt's Bees has marketed the Products with the phrases "100% Natural" and "100% Natural Origin" when, in fact, they contain indicators of unsustainable and unnatural PFAS.

379.   Burt's Bees has violated, and continues to violate, § 349 of the New York General Business Law, which makes deceptive acts and practices unlawful. As a direct and proximate result of Burt's Bees' violation of § 349, Plaintiff Spindel and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

380.   Burt's Bees' improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Spindel and New York Subclass Members to purchase and to pay the requested price for the Products when they otherwise would not have or would not have purchased as much.

381.   Defendants made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

382.   Plaintiff Spindel and New York Subclass Members have been injured by their purchase of the Products, which were worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

383.   Burt's Bees' advertising and the Products' packaging and labeling induced Plaintiff Spindel and New York Subclass Members to buy the Products, to buy more of them, and/or to pay the price requested.

384.   As a direct and proximate result of Burt's Bees' violation of § 349, Plaintiff Spindel and New York Subclass Members paid for falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

385.   By reason of the foregoing, Burt's Bees is liable to Plaintiff Spindel and New York Subclass Members for actual damages or fifty dollars ($50) for each purchase of a Burt's Bees Product (whichever is greater), attorneys' fees, and the costs of this suit. The court may, in its discretion, increase the award of damages to an amount up to three times the actual damages, up to $1000, based on Burt's Bees' willful and knowing violation of § 349.

386.   In addition, Burt's Bees continues engaging in the deceptive conduct and, upon information and belief, will do so unless enjoined by this Court. New York Subclass Members that

Plaintiff Spindel seeks to represent are purchasing, and will continue to purchase, the misrepresented Products.

387. The unfair and deceptive acts and practices of Burt's Bees, as described above, present an ongoing threat to Plaintiff Spindel and the New York Subclass Members.

## COUNT XIII

### Violation Of The New York General Business Law § 350
### (On Behalf of Plaintiffs and the New York Subclass)

388. Plaintiff Spindel hereby adopts and incorporates by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

389. The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

390. New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

391. GBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

392. Plaintiff Spindel and New York Subclass Members are consumers who purchased Burt's Bees' Products in New York.

393. As a seller of goods to the consuming public, Burt's Bees is engaged in the conduct of business, trade, or commerce within the intended ambit of GBL § 350.

394. Burt's Bees' representations made by statement, word, design, device, sound, or any combination thereof, and also the extent to which Burt's Bees' advertising fails to reveal material facts with respect to its Products, as described above, constitute false advertising in violation of the New York General Business Law.

395. Burt's Bees' false advertising was knowing and intentional.

396. Burt's Bees' actions led to direct, foreseeable, and proximate injury to Plaintiff Spindel and New York Subclass Members.

397.     As a consequence of Burt's Bees' deceptive marketing scheme, Plaintiff Spindel and New York Subclass Members suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, would not have paid the requested price for the Products, and/or would have purchased less of the Products; moreover, as a result of Burt's Bees' conduct, Plaintiff Spindel  and the New York Subclass Members received products of less value than what they paid for.

398.     By reason of the foregoing, Burt's Bees is liable to Plaintiff Spindel and New York Subclass Members for actual damages or five hundred dollars ($500) for each sale of a Product (whichever is greater), attorneys' fees, and the costs of this suit. The court may, in its discretion, increase the award of damages to an amount up to three times the actual damages, up to $10,000, based on Burt's Bees' willful and knowing violation of § 350.

399.     If its conduct is not enjoined by this Court, Burt's Bees will continue to deceptively market its Products in New York.

## COUNT XIV

### Unjust Enrichment
### (In the alternative, on behalf of Plaintiffs and All Class Members)

400.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-219 as though fully set forth herein.

401.     As the intended, direct, and proximate result of Defendants' conduct, Defendants have been unjustly enriched through sales of the Products at the expense of Plaintiffs and the putative Class Members.

402.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs and the putative Class members, in light of the fact that the Products they purchased were not what Defendants represented to them.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

A.    Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Name Plaintiffs as Class Representatives of the Classes;

C.    Name Plaintiffs' counsel as Class Counsel for the Classes;

D.    Enter a declaration that Burt's Bees is financially responsible for notifying members of the Class of the pendency of this suit;

E.    Award damages, including compensatory and statutory damages, other monetary damages, and/or disgorgement pursuant to the applicable statutes to Plaintiffs and the Classes in amounts to be determined at trial;

F.    Award exemplary damages, including treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.    Enter an order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Burt's Bees as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

H.    Permanently enjoin Defendants from engaging in the unlawful and deceptive conduct alleged herein;

I.    Award Plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

J.    Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the maximum rate allowable by law; and

K.    Award such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  July 27, 2022                    **SHUB LAW FIRM LLC**

By:   */s/ Jonathan Shub*
Jonathan Shub

Jonathan Shub (State Bar No. 237708)
Kevin Laukaitis*
134 Kings Hwy E, Fl-2

Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

L. Timothy Fisher (State Bar No. 191626)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
T: 925-300-4455
F: 925-407-2700
ltfisher@bursor.com

Rachel Soffin*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
rsoffin@milberg.com

Harper T. Segui*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
Mt. Pleasant, SC 29464
T: 919-600-5000
hsegui@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

Thomas A. Pacheco*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
15453 Indianola Drive
Derwood, MD 20855
T: 919-600-5000
tpacheco@milberg.com
*Application to be admitted*

Kim E. Richman (*pro hac vice* forthcoming)
**RICHMAN LAW & POLICY**
1 Bridge Street, Suite 83
Irvington, New York 10533
T: 718-878-4707
F: 212-687-8292
krichman@richmanlawpolicy.com

Danielle Perry, SBN # 292120
Gary E. Mason*
**MASON LLP**
5101 Wisconsin Ave., NW Ste. 305
Washington DC 20016
Tel: (202) 640-1160 / Fax: (202) 429-2294
gmason@masonllp.com
dperry@masonllp.com

*Attorneys for Plaintiffs*